J-S35016-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.J.A.M., A MINOR | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: K.D.M., FATHER | : : : : : : : : | No. 792 MDA 2023 |

Appeal from the Decree Entered May 8, 2023
In the Court of Common Pleas of Luzerne County Orphans' Court at
No(s):  A-9312

BEFORE:   PANELLA, P.J., McLAUGHLIN, J., and COLINS, J.[*]

MEMORANDUM BY McLAUGHLIN, J.:     **FILED: NOVEMBER 20, 2023**

K.D.M. ("Father") appeals from the decree terminating his parental rights as to his minor child, A.J.A.M. ("Child"). We affirm.

Child was born in March 2014. In August 2020, Child was adjudicated dependent and placed in the custody of Luzerne County Children and Youth Services ("Agency") after Child's mother ("Mother")[1] overdosed on heroin in the presence of Child. N.T., 11/30/22, at 30-31. At that time, Father was incarcerated and had been in prison since 2018. *Id.* at 31, 37-38. Child was placed with his maternal grandmother ("Maternal Grandmother"). *Id.* at 65. In January 2022, Father was sentenced to five to 10 years' incarceration for voluntary manslaughter. *Id.* at 32. Father has remained incarcerated

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] Mother consented to the adoption of Child and is not a party to this appeal.

throughout the life of this case, most recently at SCI Frackville. *Id.* at 31-32, 42.

Approximately 20 months after the adjudication of dependency and placement of Child, in April 2022, the Agency filed a petition for the involuntary termination of Father's parental rights. The court held a hearing on the petition on November 30, 2022.

The Agency presented the testimony of case worker Mindy Jenkins. Jenkins testified that Father's goals were to attend parenting education and undergo mental health and drug and alcohol evaluations. *Id.* at 31. Jenkins stated that she had no verification or documentation as to Father's engagement in any of the services that were ordered by the court. *Id.* at 33-34. She stated that she last spoke to Father in July 2022, at which time Father did not indicate that he was involved in any services. *Id.* at 34. Father told Jenkins that he was having some phone contact with Child but there was not a set schedule. *Id.* at 35. Jenkins asked Father for his corrections counselor's name so that she could inquire as to the prison's visitation policy, but Father was unable to recall his counselor's name. *Id.* at 34-36. Father indicated to Jenkins that prior to being transferred to SCI Frackville, he was having regular phone contact with Child at his previous prisons through Maternal Grandmother. *Id.* at 36-37, 49. Father indicated to Jenkins that when he is released from prison, "he would be open to having [Child] with him and his current wife." *Id.* at 37.

Jenkins provided her phone number to Father, but Father never contacted Jenkins regarding the case or to request visits with Child. *Id.* at 39, 57. Jenkins stated that Father has had minimal contact with Child and is not able to care for Child at the present time. *Id.* at 38.

Jenkins further testified that Child has resided with Maternal Grandmother since he came into placement in 2020. *Id.* at 64-65. Jenkins stated that Maternal Grandmother's home is "always appropriate," and that Maternal Grandmother meets all of Child's physical, medical, developmental, and emotional needs. *Id.* at 66-67. Jenkins indicated that Child is very comfortable in Maternal Grandmother's home, plays sports, and is doing very well in school. *Id.* at 66-68. She testified that Maternal Grandmother is very nurturing to Child and observed that Maternal Grandmother and Child are very affectionate with each other. *Id.* at 67. She stated there is a "very strong bond between the two of them" and Maternal Grandmother wishes to adopt Child. *Id.* at 65, 68. Jenkins testified that although Child has a bond with Father and enjoys phone and FaceTime contact with Father, she believed "that a parental bond is more established with [M]aternal [G]randmother." *Id.* at 50, 73. Maternal Grandmother indicated to Jenkins that she would allow Child to have contact with Father if she was to adopt him. *Id.* at 70. Jenkins opined that it was in Child's best interest for Father's parental rights to be terminated and Child would suffer no detrimental impact. *Id.*

Upon cross-examination, Jenkins testified that there have been six case workers from the Agency involved in Father's case since the case was opened.

*Id.* at 41. She indicated that the case file reflected that the Agency contacted Father on two occasions from August 2020 to July 2022. *Id.* at 43. Jenkins noted that when this case first arose, Father was incarcerated at Luzerne County Correctional Facility where court-ordered services offered by the prison were restricted due to the COVID-19 pandemic. *Id.* at 48. Jenkins agreed that Father could not be held responsible for not engaging in services that were not available at Luzerne County Correctional Facility due to the pandemic. *Id.* at 49. Jenkins stated that according to Maternal Grandmother, Father was having regular contact with Child up until he was transferred to SCI Camp Hill and subsequently to SCI Frackville. *Id.*

The Agency also presented the testimony of Father's corrections counselor at SCI Frackville, Nicole Citeron. Citeron testified that Father entered SCI Frackville in April 2022. *Id.* at 12. At that time, there were no COVID-19 restrictions in place, except that the inmates were required to eat their meals in their cells. *Id.* at 19. Citeron stated that Father's minimum date of incarceration is September 2023 and his maximum date is September 28, 2028. *Id.* at 12-13. She testified that Father was enrolled in a violence prevention program at the prison and was scheduled to complete the program in January 2023. *Id.* at 13-14. She indicated that Father was not recommended for any drug and alcohol or mental health programs by his previous prison at SCI Camp Hill, but he could voluntarily participate in those programs at SCI Frackville. *Id.* at 15, 19-21. Father did not have any

certificates for any other voluntary or educational programs offered at SCI Frackville. *Id.* at 14-15.

Citeron testified that Father completed a written form to have in-person visits with Child in May 2022. *Id.* at 24-25. She stated that typically when a child is in the custody of the Agency, she sends the visitation form to the Agency's case worker to coordinate the visits between the inmate and the child. *Id.* at 26-28. However, Citeron stated that Father never informed her that Child was in the custody of the Agency or provided her with the case worker's name, so the form was never sent to the Agency. *Id.*

Father testified at the termination hearing. He stated he was currently incarcerated at SCI Frackville and over the course of this case, he was previously incarcerated at SCI Camp Hill, SCI Smithfield, and Luzerne County Correctional Facility. *Id.* at 77-78. Father stated that because of the COVID-19 pandemic, he had problems having physical visitation with Child. *Id.* at 78. He said he was unable to access court-ordered services at SCI Camp Hill, SCI Smithfield, and Luzerne County Correctional Facility due to the pandemic. *Id.* at 78-79. According to Father, he completed a victims awareness program at SCI Frackville. *Id.* at 80. He stated that he "want[ed] to start enrolling in" drug and alcohol, mental health, and parenting classes at SCI Frackville. *Id.* at 80-81. He testified that he had phone contact with Child up until April 2022, but was having difficulty scheduling phone contact once he was transferred to SCI Frackville. *Id.* at 84-85.

Father further testified that he was sentenced to five to 10 years' incarceration for voluntary manslaughter, but an appeal was pending. *Id.* at 83. He indicated that his minimum release date was September 28, 2023, and he was scheduled to appear before the parole board in May 2023. *Id.* at 84. Father stated that he has had multiple case workers from the Agency and was contacted twice by the Agency's case workers since the case began. *Id.* 87-88. Father conceded that he never informed Jenkins or the Agency that he was having issues contacting Child. *Id.* at 91, 95. He also acknowledged that he never attempted to contact the Agency by telephone or letter at any time after learning Child was in the Agency's custody. *Id.* at 95-96. Father maintained he loves Child and wished to retain his parental rights. *Id.* at 88, 92.

The trial court found that the Agency proved by clear and convincing evidence that Father's parental rights should be terminated under Section 2511(a)(2) and Section 2511(b) of the Adoption Act. Father filed a notice of appeal and raises the following issues:

1. Whether the [t]rial [c]ourt abused its discretion and/or committed an error of law in determining the parental rights of [Father] to [Child] should be terminated pursuant to 23 Pa.C.S.A. § 2511(a)(2).

2. Whether the [t]rial [c]ourt abused its discretion and/or committed an error of law in determining the tenets of 23 Pa.C.S.A. § 2511(b) have been satisfied and the best interests of [Child] served by terminating the parental rights of [Father].

Father's Br. at 4.

We review an order involuntarily terminating parental rights for an abuse of discretion. *In re G.M.S.*, 193 A.3d 395, 399 (Pa.Super. 2018). In termination cases, we "accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (quoting *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012)). "If the factual findings have support in the record, we then determine if the trial court committed an error of law or abuse of discretion." *In re Adoption of K.C.*, 199 A.3d 470, 473 (Pa.Super. 2018). We will reverse a termination order "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *In re Adoption of S.P.*, 47 A.3d at 826 (citation omitted).

A party seeking to terminate parental rights has the burden of establishing grounds for termination by "clear and convincing evidence." *In re Adoption of K.C.*, 199 A.3d at 473 (citation omitted). Clear and convincing evidence means evidence "that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." *Id.* (quoting *In re Z.S.W.*, 946 A.2d 726, 728-29 (Pa.Super. 2008)).

Termination of parental rights is controlled by Section 2511 of the Adoption Act. *In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007). Under this provision, the trial court must engage in a bifurcated analysis prior to terminating parental rights:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*Id.* (citations omitted).

Here, the court terminated Father's parental rights under Section 2511(a)(2). That Section provides:

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\*\*\*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2).

Section 2511(a)(2) thus requires the moving party to prove three things by clear and convincing evidence: "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence;

- 8 -

and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re K.Z.S.*, 946 A.2d 753, 758 (Pa.Super. 2008) (citation omitted). "The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; those grounds may also include acts of refusal as well as incapacity to perform parental duties." *Id.* (citation omitted). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." *Matter of Adoption of M.A.B.*, 166 A.3d 434, 443 (Pa.Super. 2017) (citation omitted).

As to incarcerated parents, "incarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under [Section] 2511(a)(2) where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied." *In re Adoption of S.P.*, 47 A.3d at 828. While incarceration alone is not sufficient to support termination, "incarceration will certainly impact a parent's capability of performing parental duties, and may render a parent incapable of performing parental duties under [Section 2511](a)(2)." *Int. of K.M.W.*, 238 A.3d 465, 474 (Pa.Super. 2020) (*en banc*) (citation omitted) (emphasis removed). An incarcerated parent is expected to "take affirmative steps to support a parent-child relationship" and "utilize whatever resources are available to him while in prison in order to foster a continuing close relationship with his children." *In re E.A.P.*, 944 A.2d

79, 83 (Pa.Super. 2008). Further, the length of the confinement can be considered as "highly relevant" in a Section 2511(a)(2) analysis. *In re Adoption of S.P.*, 47 A.3d at 830.

Here, Father argues that the Agency failed to present clear and convincing evidence to warrant the termination of his parental rights under Section 2511(a)(2). While he concedes that he has been incarcerated since before the case's inception, he argues incarceration alone is not *per se* evidence of parental incapacity and that the court impermissibly gave undue weight to the fact of his incarceration. Father's Br. at 8-9.

Father further contends that he completed an assessment by the Agency, which recommended that he attend parenting education and undergo mental health and drug and alcohol evaluations. *Id.* at 8. However, he argues that he was precluded from accessing those services at Luzerne County Correctional Facility, SCI Smithfield, and SCI Camp Hill due to COVID-19 restrictions. *Id.* at 9-10. Father points out that Citeron testified that since being incarcerated at SCI Frackville, he was engaged in a violence prevention program and that no other drug and alcohol or mental health programs were recommended for him. *Id.* at 10. He further highlights that the Agency made only two attempts to contact him throughout the case. *Id.* at 12.

Lastly, Father's appellate brief claims that Father went before the parole board in May 2023 and "it now appears he will be released from incarceration in September 2023." *Id.* at 13 (emphasis removed). He thus concludes that

"it would appear that the [t]rial [c]ourt's sole basis for terminating [Father's] parental rights will no longer be of concern." *Id.* at 14.

In finding grounds for termination of Father's parental rights pursuant to Section 2511(a)(2), the court stated:

> Credible testimony at the termination hearing was presented to show, by clear and convincing evidence, that Father is incapable of presently providing a safe and healthy living environment for [C]hild. Father has been incarcerated throughout the entire period of [C]hild's placement. His maximum date of release from incarceration is September 28, 2028. Father is incapable of providing parental care which is necessary for the physical and mental well[-]being of [C]hild. Father's lengthy incarceration precludes him from being able to provide the essential parental care to ensure the physical and mental well-being of [C]hild.

Trial Court Memorandum Issued Pursuant to Pa.R.A.P. 1925(a), filed July 13, 2023, at 9 (citation to transcript omitted).

A review of the record supports the court's finding of grounds for termination under Section 2511(a)(2). Father has been incarcerated continuously since 2018 to the present time. His minimum release date was September 2023 and his maximum release date is September 2028. Although Father's brief claims that Father went before the parole board in May 2023 and that it "appears" he would be released from prison in September 2023, there is no evidence in the record of this. *See Commonwealth v. McBride*, 957 A.2d 752, 757-58 (Pa.Super. 2008) (observing that statements contained in appellate briefs are not evidence and cannot be considered part of the record on appeal). It is thus speculative as to when and if Father will be in a position to provide parental care for Child. Child had been in care for over two

- 11 -

years at the time of the termination hearing and cannot wait for permanency any longer.

To the extent Father argues that termination was improper because of the Agency's lack of communication or failure to make reasonable efforts to reunify him with Child, Section 2511(a)(2) does not require "a court to consider the reasonable efforts provided to a parent prior to termination of parental rights." *In re D.C.D.*, 105 A.3d 662, 672 (Pa. 2014); *see id.* at 672-73 (holding that the provision of reasonable efforts to reunify parents and children is not a requirement for termination). Moreover, the evidence was that Father was notified that Child was in the custody of the Agency when Child was adjudicated in August 2020. Father admitted that he never attempted to contact the Agency by telephone or letter regarding any concerns about the case, including requesting assistance with visitation with Child. It was Father's responsibility to make diligent efforts toward assuming his parental responsibilities, and thus, to make reasonable inquiries about Child. *See In re E.A.P.*, 944 A.2d at 83; *Matter of Adoption of M.A.B.*, 166 A.3d at 443. The record demonstrates that Father's repeated and continued incapacity due to ongoing incarceration has caused Child to be without essential parental care, control, or subsistence necessary for his physical or mental well-being and the conditions and causes of Father's incapacity cannot or will not be remedied. Thus, we discern no abuse of discretion by the court in concluding that termination pursuant to Section 2511(a)(2) was warranted.

In his second issue, Father contends that the trial court abused its discretion by finding that termination of his parental rights was in the Child's best interest pursuant to Section 2511(b). Father's Br. at 14. He argues that he consistently had phone contact with Child through his incarceration at Luzerne County Correctional Facility and that "[p]roblems only arose after [he] was transitioned into the state correctional system in March 2022." *Id.* at 14-15. Father also points out that Jenkins acknowledged that Child has a bond with Father and Child enjoys talking to him and seeing him on FaceTime. *Id.* at 15.

The focus under Section 2511(b) is not on the parent, but on the child. *In re Adoption of R.J.S.*, 901 A.2d 502, 508 (Pa.Super. 2006). Under Section 2511(b), the trial court must consider "the developmental, physical and emotional needs and welfare of the child" to determine if termination of parental rights is in the best interest of the child. *See* 23 Pa.C.S.A. § 2511(b). This inquiry involves assessment of "[i]ntangibles such as love, comfort, security, and stability[.]" *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa.Super. 2005). The court must also examine the parent-child bond, "with utmost attention to the effect on the child of permanently severing that bond." *Id.* However, the "mere existence of an emotional bond does not preclude the termination of parental rights." *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011). Rather, the trial court must consider whether severing the bond "would destroy an existing, necessary and beneficial relationship." *Id.* (citation

- 13 -

omitted). The court must also examine any pre-adoptive home and any bond between the child and the foster parents. ***In re T.S.M.***, 71 A.3d at 268.

Here, the trial court determined that the Agency had established by clear and convincing evidence that termination was proper under Section 2511(b). The record supports the court's finding. Jenkins testified that Child has a very nurturing and strong bond with Maternal Grandmother, with whom he has consistently lived since he was placed, and Maternal Grandmother meets all of Child's physical, medical, developmental, and emotional needs. Child is thriving in Maternal Grandmother's care, and she is eager to adopt him. Although Child has a bond with Father, the testimony was that Child has his parent-child bond with Maternal Grandmother. The evidence also showed that Child would suffer no detrimental impact if Father's parental rights were terminated. Accordingly, we agree with the court's finding that the Agency proved by clear and convincing evidence that termination of Father's parental rights was in Child's best interest.

Decree affirmed.

Judgment Entered.

_____

Benjamin D. Kohler, Esq.
Prothonotary

Date: 11/20/2023